ESTATE OF OLÍVAS & CO. v. J. MATIENZO & CO.

APPEAL from the District Court of San Juan, First Section.

No. 116.—Decided December 12, 1907.

APPEAL—DECISION NOT SUPPORTED BY THE EVIDENCE.—The question as to whether or not the decision is supported by the evidence taken at the trial cannot be considered on appeal where the appeal is not taken within the 15 days next following the date on which judgment is rendered.

CONTRACT—INDEMNITY FOR FAILURE TO COMPLY THEREWITH.—In estimating the damages occasioned by failure to comply with a contract, the duration of which is continuous, such as for the delivery of a certain quantity of milk daily, the court must not take into consideration damages which may occur in the future—that is to say, between the date on which the complaint is filed and the date fixed for the expiration of the contract—because it is impossible to say whether such a failure to comply will be persisted in or that some inevitable accident sufficient to excuse such failure may not occur; therefore, indemnity for damages must be limited to the date of the filing of the complaint.

ID.—NEW CAUSE OF ACTION FOR SUBSEQUENT NONCOMPLIANCE.—In accordance with the foregoing doctrine, the plaintiff has a right to bring a new action for the damages which he may suffer after the date on which complaint is filed.

The facts are stated in the opinion.

*Messrs. Sarmiento* and *López Landrón,* for appellants.

*Mr. Mott* for respondents.

MR. JUSTICE MACLEARY delivered the opinion of the court.

This is an appeal taken from a judgment rendered by the District Court of San Juan, in the first section of the same, on the 15th day of October, 1906. The action was brought for

damages for breach of contract. It is alleged that the defendants, J. Matienzo & Co. and J. Matienzo individually, made a contract with the plaintiffs, who are the successors of Olivas & Co., whereby the defendants agreed to deliver to the plaintiffs daily 200 quarts of milk, for which they were to receive in payment 5½ cents per quart, or $11 daily. Other particulars are alleged pertaining to the contract and the breach of the contract, for failure to deliver and consequent damage, in the sum of $4 per day for two years, or $2,920 in the aggregate. It is contended by counsel for the appellees in his brief and oral argument, that the appeal taken by J. Matienzo, in his individual capacity, should be dismissed because he did not appear in this court and file his brief within the time required by law. As the judgment of the lower court was in his favor the dismissal of Matienzo's appeal could have no practical effect; but as this court desires to comply with its own rules, the appeal made by J. Matienzo individually will not be considered and it may be regarded as virtually dismissed, and an order may be entered to that effect. Counsel for appellees insists in his brief that, inasmuch as this appeal was taken from the judgment and more than 15 days after its rendition, this court cannot inquire into the evidence and determine whether or not it supports the decision, but that as the record is presented here this court is confined to the inquiry whether or not the judgment is consistent with the findings.

In support of this view counsel cites section 295 of the Code of Civil Procedure. This section of the Code in the first paragraph thereof says:

"* * * But an exception to the decision or verdict, on the ground that it is not supported by the evidence cannot be reviewed on an appeal from the judgment unless the appeal is taken within 15 days after the rendition of the judgment."

We must accept this view and thus construe the section cited. The appeal, being taken from the judgment, brings

in review only the law pertinent to the case and not the evidence on which the decision is based. This has been the practice in this court, whenever the matter has been called to its attention, since the adoption of the Code of Civil Procedure, on the 1st of July, 1902, and we do not feel justified in disturbing it now. See Case of *Román* v. *American Railroad Co. of P. R.*, decided on the 29th day of January, 1906; 3 Decisions of Porto Rico, pp. 31 and 32 *et seq.*, and *Maisonave* v. *Maisonave et al.*, decided the 5th of December, 1907. This construction may not conform to some of the decisions of the appellate courts in the various States of the Union, but it is in conformity with the rules laid down in California by the Supreme Court of that State in construing an entirely similar statute.

Section 939 Code of Civil Procedure of California. *Clark* v. *Gridly*, 49 Cal., 108; *Handley* v. *Figg*, 58 Cal., 580; *Coonan* v. *Lowenthal*, 129 Cal., 201; *Ryland* v. *Heney*, 130 Cal., 429.

The opinion of the district judge trying the case, which includes the findings of fact and the conclusions of law which he deemed proper and pertinent to the decision of the case, reads as follows:

"In order to reach a final decision in this suit, the court has taken great care in weighing all the evidence, and especially the testimony of the witnesses, taking into consideration the greater or lesser assurance with which each witness gave his testimony, the hesitations and doubts of some of the witnesses, the interest they might have in testifying, whether their statements were contradicted by their actions and words, and, in short, believes to have properly weighed and considered the value of all the evidence; and as a consequence of said evidence and the arguments of counsel, the court has arrived at the following conclusions:

"1. That, on the night of the 5th or 6th of October, 1905, in the *Café 'La Mallorquina'*, which belongs to the plaintiffs, the latter, in the presence of several witnesses, made an agreement with Joaquin Matienzo, as representative of J. Matienzo & Co., in regard to the following particulars, which were the only ones treated of:

"(*a*) J. Matienzo & Co. bound themselves (by said agreement)

daily to deliver to Successors of Olivas & Co., 200 quarts (*cuartillos*) of pure cows' milk, which the latter engaged themselves to receive.

"(*b*) The price of the said purchase sale was to be 5½ cents per quart (*cuartillo*).

"(*c*) The delivery of the 200 '*cuartillos*' of milk was to be made in the establishment *La Mallorquina* between 5 and 6 o'clock in the morning.

"(*d*) The contract was to continue in force for two years, and the parties were to give notice eight days before entering upon the fulfillment of the same.

"II. When the aforesaid agreement was made the contracting parties and the witnesses celebrated the same by drinking champagne, which they did out of joy that the former had reached an agreement, since there had been a long discussion about the price.

"III. When the aforesaid verbal agreement was made, J. Matienzo & Co. were not yet in possession of the cows which they intended to purchase; but on one of the last days of October, Mr. de la Haba and Mr. Joaquin Matienzo, of the commercial firm which is the defendant in this case, notified Mr. Paulino Pumarada, a partner of the firm which has brought this suit, that they had purchased the necessary cows.

"IV. It does not appear to have been properly proven that when the verbal agreement set forth under No. 1 was made, Mr. Joaquin Matienzo made any reservation, or that he informed the partner Pumarada, with whom he made the contract for the plaintiff firm, that he could make no contract, and that he needed the approval of the other partner, Mr. de la Haba.

"V. On the first day of the following month of November, J. Matienzo & Co. addressed a letter, which was written and signed by Mr. Joaquin Matienzo, in the name of the firm, to the aforesaid plaintiffs, in which letter they ratified the agreement made by Mr. Joaquin Matienzo and the plaintiffs.

"VI. Although, in the verbal agreement, no stipulations were made that the contract was to be put in writing, about the time when the letter of the 1st of November was written, the parties to this suit, at the request of J. Matienzo & Co., contemplated the execution of a private document concerning the matter.

"VII. In reply to the letter of the 1st of November successors of Olivias & Co. wrote a letter, in which they congratulated themselves that the aforesaid firm was disposed to fulfill the agreement that had been made, setting forth the stipulations of said verbal agreement,

which are those already mentioned, and informing the firm referred to, besides that on and after the 10th of the said month they would be ready to receive the milk as agreed upon.

"J. Matienzo & Co. did not answer this letter, and Mr. Joaquin Matienzo alleges that he received said letter and that he tore it up without informing his partner, Mr. de la Haba, of the same; and that he did not tell the latter anything concerning the matter until long afterwards.

"VIII. On the 10th of November the defendant company delivered to the plaintiffs, the 200 quarts (*cuartillos*) of milk; but in the afternoon of that same day the former company sent to the latter a letter, which was duly received, saying that in future they would send them no more milk because they had sold part of the milk outside of the '*Mallorquina*'.

"IX. One of the points that were discussed, although briefly, at the interview, which gave rise to the verbal agreement, was that the plaintiffs wished to receive the milk on two occasions, viz, in the morning and in the afternoon; but in view of the refusal of the defendants, they yielded soon, and accepted the condition that all the milk should be delivered in the morning.

"X. That the plaintiffs, on receiving all the milk in the morning, for fear that the same would not be fit for use in their *café* in the evening, made an agreement with Bird, Rosales & Fabián, to the effect that the latter should receive from them every morning 120 quarts of milk, at the same price of $5\frac{1}{2}$ cents per quart, at which they themselves bought the milk from the defendant company; and that, in the afternoon, said Bird, Rosales & Fabián should return the milk to them, and pay 1 cent for each quart of milk so returned. Thus of the 200 quarts of milk, the plaintiffs kept only 80 for consumption in their establishment during the morning and afternoon.

"XI. When on the 10th of November, the defendant company informed the plaintiffs, that, on the 11th, they would discontinue the delivery of the milk, the latter were obliged to buy the same at different places in this city, at a higher price than $7\frac{1}{2}$ cents, until, on the 16th or 17th of November, they were able to make an agreement with Bird, Rosales and Fabián, who undertook to furnish to them, for two years, all the milk they needed, at the rate of $7\frac{1}{2}$ cents per quart.

"XII. The acts and contracts executed or made by Mr. Joaquin Matienzo, were not executed or made by him in his own right, but in the name of J. Matienzo & Co., a civil agricultural company, which,

although constituted under the form of a company, used the name of the silent partner, and not the name of the manager, Abelardo de la Haba.

### POINTS OF LAW.

First.—The agreement made on the 5th or 6th of October, 1905, in the *Café 'La Mallorquina'*, between the two litigating firms or companies, was a contract, because it contained the three requisites which, according to section 1228 of the Civil Code, are necessary for the existence of a contract.

Second.—When Mr. Paulino Pumarada, in the name of the plaintiffs, made a contract with Joaquin Matienzo & Co., not only because it has not been proven that the said Joaquin Matienzo made a clear and definite statement to the effect, that he could not bind the firm because of his being a silent partner of the same, but also, because the name of Joaquin Matienzo figured in the firm or name of the partnership of the defendants, the plaintiffs, according to the Code of Commerce, had a legal right to consider the aforesaid Joaquin Matienzo as one of the partners of the firm, with power to bind the latter (by any contract made by him). And this without taking into account that all the stipulations that were made by him on the night referred to, were ratified by a letter dated the 1st of November which was signed by the said firm.

"Third.—Inasmuch as it has not been fully proven that the defendant company, on making the first delivery of milk, on the 10th of November, 1905, did so with the hope that they would be able to make a written contract which, in regard to some points, would be different from the agreement made on the night of the 5th or 6th of October, it seems to be logical and reasonable to admit that the said first delivery of milk, and the deliveries subsequently to be made, were the fulfillment of the verbal contract.

"Fourth.—Although the said agreement was at first a verbal agreement, it was converted into a written contract by the letter of the 1st of November, which ratified all the stipulations that had been made by Mr. Joaquin Matienzo, and more still by the letter which, on the following day, was written by Successors of Olivas & Co., in which the latter reminded the aforesaid firm of the stipulations that had been made, and which letter was not answered, denying the truth of the clauses of the agreement.

"Fifth.—Contracts are perfected or become perfect by the mere consent of the contracting parties when there is, besides such consent, a positive object or purpose which is the subject matter of the con-

tract, and the cause or reason for the obligation contracted; for, in whatever manner a person may intend to bind himself, he is bound by his contract, and such contracts are binding, no matter what their form may be, and they are not ineffectual because they were not made in writing; although the parties may be compelled to give the contract a written form, in cases where it is necessary, in order to carry into effect the obligation, or to affect the rights of third parties; and. it has been so decided by the Supreme Court of Spain, in the judgment rendered on the 17th of April, 1897, and although said decision is rather irresolute, the matter was soon afterwards decided in a resolute manner by the judgments rendered by said court, on the 4th of July, 1899, and on the 10th of July and the 19th of October, 1901.

"Sixth.—He who fails to fulfill his contract is obliged to pay damages, the amount of which must cover not only the loss suffered by the other party to the contract, but also the profit he has failed to make, and, according to this precept, the plaintiffs must be indemnified for the loss and damages they have sustained, as shown by the evidence introduced at the trial of the case.

"Seventh. As the contract was for two years—that is, 730 days— and for 200 quarts of milk per day, at 5½ cents per quart, the result is that the plaintiffs would have had to pay to J. Matienzo & Co. $11 per day; and as the milk bought by them at the present time costs 7 cents per quart, they have to pay $14 per day, which makes a difference of $3 per day, or of $2,010 for the two years, to the prejudice of said plaintiffs. But since the latter delivered of the 200 quarts of milk which they received from J. Matienzo & Co., 120 quarts to Bird, Rosales & Fabián, to be returned in the afternoon, with 1 cent of· profit per quart, the loss of the plaintiffs is diminished $1.20 per day, which makes a total of $804, for the two years; and after deducting this amount from the aforesaid sum of $2,010, there remains a balance of $1,206, which is the amount of the damages sustained by the plaintiffs.

"Eighth.—According to the Civil Code in force, exemplary damages—that is, the obligation to pay—besides the damages hereinbefore mentioned, another sum as penalty, cannot be imposed."

We must accept the facts as settled by the findings of the district court. Then, are the conclusions of law correct as based on the findings made and is the judgment of the court justified by the facts and the law as set forth by the district court in its opinion and the judgment rendered? We will

not follow in this discussion the points of law set out by the trial court in the opinion contained in the record, but rather the questions raised by counsel for the appellants and the respondents in presenting the case for our consideration.

We must take it as settled in the trial court, as the case is presented in this record, that a contract existed between the appellants and the respondents for the purchase and sale of milk, and that it was made in writing by the letters which passed between the parties. It further appears, from the record as presented, that this contract was broken by J. Matienzo & Co. by the nondelivery of the milk after the first daily delivery made on the 10th day of November, 1905.

Whether or not the contract was required to be in writing to establish its efficacy and binding force it is unnecessary to decide, since the trial court has found that the same was written, and we accept that finding as final on this appeal as presented. It is also clear, from this view of the case, that the breach of the contract for the delivery of milk, on which this action is based, caused damages and losses to the respondents and we must review the facts found by the court in order to fix the amount.

By the contract the defendants were obliged to deliver to the plaintiffs 200 quarts of milk daily for two years beginning on the 10th day of November, 1905. For this milk the plaintiffs were bound to pay the defendants 5½ cents for each quart or $11 daily for the 200 quarts to be delivered. The defendants, on this contract, made one delivery only of 200 quarts of milk, on the 10th of November following, alleging as a reason for such refusal that the plaintiffs "had sold part of the milk outside of the '*Mallorquina,*'" that being the *café* kept by the plaintiffs. There was a failure to deliver for the remaining 729 days, necessary to complete the period of two years, and the plaintiffs were compelled to make another contract for the supply of milk at the increased price of 7½ cents per quart. This was presumably for two deliv-

eries daily as was necessary to meet the requirements of the plaintiffs' business. This was found to be an established fact by the court below and is not disputed. Then the damages for nondelivery of the 200 quarts of milk would amount to 2 cents per quart, or $4 daily. But the plaintiffs could not use all of the milk, which was delivered only in the morning, between 5 and 6 o'clock, because it would be likely to sour before night, so they contracted with another party to exchange with them 120 quarts of milk daily, and to take that amount of milk in the morning, and return them the same quantity at night, plaintiffs paying for this exchange 1 cent per quart, or $1.20 daily. Deducting this sum from the $4, as we must do to arrive at a correct estimate of the damages suffered by plaintiffs, that sum is reduced to $2.80 (two dollars and eighty cents) per day.

The next question arising for our determination is for how many days are these damages to be computed? The trial court included the whole time of the two years, less the one day on which the milk was delivered, and gave judgment for $2,010 (two thousand and ten dollars).

We think that in estimating the damages, under a continuing contract such as this, for the daily breaches occurring, that the court should not have gone into the future; for no one could possibly say or determine that the daily breaches would continue, or that the price of milk in the market would remain in excess of the price fixed in the contract, or that some inevitable accident would not intervene to prevent a compliance with the contract and to excuse the defendants therefrom. Then at least the damages should not have been calculated beyond the date on which the judgment was rendered, to wit, 15th of October, 1906.

But we are constrained to hold that the amount of the judgment must be limited to the breaches which had occurred up to the date of the filing of the complaint, which, although it is not exactly shown in the record, could not have been later

than the 24th of April, 1906—making 165 (one hundred and sixty-five) days. The current of authorities, as far as we have been able to review the adjudicated cases, is consistent with this view, and we must follow them.

Reference may be made to the following extract from an opinion of the Court of Appeals of the District of Columbia, to wit:

"An action to recover damages for breach of a contract to pay a sum of money in installments due at the time of bringing the suit and subsequent installments falling due after action brought cannot be included in the recovery, or in any other manner reckoned in the plaintiff's claim, so as to support the jurisdiction of the court, or to justify the rendition of a judgment for the entire sum claimed." (*Mansfield* v. *Winter,* 10 App. Cases D. C., 549, citing 145 U. S., 224, which cites in turn same volume, page 123.)

According to this rule the damages and losses suffered by the plaintiffs at the hands of the defendants, by reason of the breach of the contract sued on, should be calculated at the rate of $2.80 (two dollars and eighty cents) per day for 165 (one hundred and sixty-five) days amounting to the sum of $462 (four hundred and sixty-two dollars).

Of course, under this view of the case, the plaintiffs are at liberty to bring a new action for any damages which may have occurred since the 24th of April, 1906, the date on which the complaint in this case is taken to have been filed.

This case has been held under advisement for a long time owing to the numerous questions presented and arising from the record, many of which have been omitted from this opinion, but all of which have received careful study and full discussion and consideration. But it is unnecessary to review the law or the facts connected therewith any further, owing to the limits imposed by section 295 of the Code of Civil Procedure, heretofore cited and discussed and construed.

Then the judgment of the court below should be modified and reformed as indicated herein.

*Accordingly decided.*

Chief Justice Quiñones and Justices Hernández, Figueras and Wolf concurred.